IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

KIM PRINGLE,

      Plaintiff,

vs.

COMMISSIONER OF SOCIAL
SECURITY ADMINISTRATION,

      Defendant.

CASE NO. 3:25-cv-2238

MAGISTRATE JUDGE
JAMES E. GRIMES JR.

**MEMORANDUM
OPINION AND ORDER**

Plaintiff Kim Pringle filed a Complaint against the Commissioner of Social Security seeking judicial review of the Commissioner's decision denying disability insurance benefits. This Court has jurisdiction under 42 U.S.C. §§ 405(g) and 1383(c). The parties consented to my jurisdiction in this case. Doc. 7. Following review, and for the reasons stated below, I affirm the Commissioner's decision.

**Procedural history**

In June 2023, Pringle filed an application for disability insurance benefits, alleging a disability onset date of April 10, 2022.[1] Tr. 158. In her application, Pringle claimed disability due to bipolar disorder, manic posttraumatic stress disorder (PTSD), major depressive disorder, panic

---

[1] "Once a finding of disability is made, the [agency] must determine the onset date of the disability." *McClanahan v. Comm'r of Soc. Sec.*, 193 F. App'x 422, 425 (6th Cir. 2006).

disorder, fear of social situations and open spaces, social anxiety disorder, and generalized anxiety disorder. Tr. 207. The Social Security Administration denied Pringle's application and her motion for reconsideration. Tr. 59–60. Pringle then requested a hearing before an Administrative Law Judge (ALJ). Tr. 86.

In October 2024, an ALJ held a hearing, during which Pringle and a vocational expert testified. Tr. 37–54. In December 2024, the ALJ issued a written decision finding that Pringle was not disabled. Tr. 18–32. The ALJ's decision became final on August 20, 2025, when the Social Security Appeals Council declined further review. Tr. 1–4; *see* 20 C.F.R. § 404.981.

Pringle filed this action on October 20, 2025. Doc. 1. She asserts the following assignment of error:

> Whether the Administrative Law Judge's decision is supported by substantial evidence when he failed to properly evaluate the opinions of plaintiff's treating sources.

Doc. 8, at 1.

**Evidence**

*Personal and vocational evidence*

Pringle was 54 years old on her alleged disability onset date. Tr. 30. She graduated from high school and last worked as a manager at a Walmart store. Tr. 41–42.

*Relevant medical evidence*

In July 2023, Pringle saw Nurse Practitioner Joey Dehoff by video at Parkview Physician's Group to follow-up for her conditions, including severe manic bipolar disorder, generalized anxiety disorder, PTSD, social anxiety disorder, and psychophysiological insomnia. Tr. 407. Pringle reported auditory hallucinations, seeing shadows, and panic attacks. Tr. 409. She inquired about an inpatient hospitalization, which Dehoff recommended. Tr. 407, 409. Pringle was then admitted to Maple Heights Behavioral Health for three days for severe depression and suicidal ideation. Tr. 330. At intake, she stated that her numerous medications weren't helping. Tr. 330, 333. Two days later, Pringle explained that her "mood [wa]s all over the place" and went "from one extreme to the other" without notable triggers. Tr. 304. Her medications were adjusted. Tr. 307. On her discharge date, Pringle was feeling "pretty good," denied depression, and said that her medications were "doing a good job" of keeping her anxiety low. Tr. 310.

In late September 2023, Nicholson followed up with Dehoff by video. Tr. 354. She reported feeling "extremely depressed," which she said was "better in some ways" since she wasn't "that high." Tr. 356. She was sleeping better, but she still felt anxious and was having auditory, visual, and tactile hallucinations. Tr. 356. Pringle continued to experience social anxiety. Tr. 356. As a result, she felt incapable of participating in intensive outpatient therapy; however, she reported having driven to have her nails done the week before

3

her appointment. Tr. 356. Dehoff adjusted Pringle's medications. Tr. 361–62. Dehoff noted that Pringle was on short-term disability from her job at Walmart. Tr. 357.

In October 2023, Pringle began treating with Nurse Practitioner Nathan Miner at Parkview Behavior Health Institute. Tr. 754. Pringle had no immediate concerns that day, other than she felt hesitant to change providers and medications. Tr. 754. Pringle was taking the following medications: Lybalvi, Lithobid, Gabapentin, Hydroxyzine, and Trazodone. Tr. 754. On exam, Miner described Pringle as being appropriately dressed, well-groomed, and cooperative. Tr. 765. She was pleasant, fidgety, attentive, engaged, and had good eye contact. Tr. 765. Pringle had an anxious mood and affect; appropriate speech; and logical, goal-directed, coherent, and spontaneous thought processes. Tr. 765. She denied auditory and visual hallucinations. Tr. 765. She had appropriate thought content and no delusions or memory disturbances. Tr. 765. Pringle exhibited appropriate insight and good judgment. Tr. 765. Miner continued her medications. Tr. 768.

At a follow-up visit with Miner a few weeks later, Pringle complained of "extremely high anxiety" and difficulty staying asleep. Tr. 739. She reported auditory and visual hallucinations and being easily annoyed. Tr. 739. She said that her symptoms had significantly worsened over the past five years, since her husband died. Tr. 739. Pringle's exam findings were the same as her last visit, except that she had mild memory disturbances that were likely due to

4

anxiety. Tr. 751. Miner assessed bipolar "disorder, depressed, severe, with psychotic features"; generalized anxiety and social anxiety disorder with panic attacks; psychophysiological insomnia; and complex PTSD. Tr. 752–53. He adjusted Pringle's medications. Tr. 739.

In December 2023, Pringle had a walk-in visit with Nurse Practitioner Valerie Rumple at Parkview and said that her medications were not working. Tr. 723. Pringle reported depression, anxiety, poor sleep, stressors, and "not great" concentration. Tr. 723. She described increased irritability and daytime tiredness. Tr. 723. She reported visual hallucinations of people and bugs and felt them touching her. Tr. 723. Rumple wrote that Pringle was "very restless" during the appointment. Tr. 723. She reviewed Pringle's medication records and suggested changes. Tr. 724.

In early January 2024, Pringle had a follow-up appointment with Miner. Tr. 692. Miner reviewed Pringle's interval history, including a hospitalization in late December for suicidal ideation. Tr. 692. While hospitalized, some of Pringle's medications were adjusted, but the adjustments hadn't continued after she was discharged. Tr. 692. Pringle's mental exam findings were the same as her last visit with Miner. Tr. 706, 751. Miner adjusted Pringle's medications to match the dosage she had received in the hospital, and increased, continued, and started other medications. Tr. 692.

In late January 2024, Pringle followed up with Miner for a medication review. Tr. 675. She was still on medical leave from Walmart. Tr. 675. She

5

continued to report auditory and visual hallucinations. Tr. 675. Pringle said that her medications weren't "doing it" and that her "depression has been awful" and she was "sleeping all the time." Tr. 675. Miner commented that one of Pringle's added medications hadn't been approved by insurance and increased her Lexapro dosage. Tr. 675. He recommended that Pringle restart therapy. Tr. 691.

In mid-February 2024, Pringle saw Ahsan Mahmood, M.D., at Parkview to be evaluated for electroconvulsive therapy[2] (ECT) "as requested by [Pringle] and her Psych NP." Tr. 674. Dr. Mahmood wrote that Pringle "[c]ontinue[d] to struggle with perpetual depression, anhedonia, melancholia and worthlessness" and that she reported auditory and at times visual hallucinations. Tr. 674. She had thoughts of not living at times but denied a suicide plan. Tr. 674. Dr. Mahmood described Pringle as casually dressed, with good hygiene and eye contact and normal speech. Tr. 674. She was alert, pleasant and cooperative. Tr. 674. Pringle described her mood as "always depressed" and Dr. Mahmood indicated that Pringle's affect was "mood congruent and passively anxious." Tr. 674. Pringle had organized and goal-directed thought processes, no paranoid ideas of reference, and no auditory or

---

[2] Electroconvulsive therapy is a procedure done under general anesthesia in which "small electric currents pass through the brain, intentionally causing a brief seizure." It "seems to change brain chemistry, and these changes can quickly improve symptoms of certain mental health conditions." *See Electroconvulsive therapy*, Mayo Clinic (https://www.mayoclinic.org/tests-procedures/electroconvulsive-therapy/about/pac-20393894) (last visited May 12, 2026).

visual hallucinations. Tr. 674. She had limited insight and judgment about her condition, but it was improving based on her seeking treatment. Tr. 674. Dr. Mahmood commented that as Pringle had tried multiple medication combinations in the past but remained depressed, she was a candidate for the ECT procedure. Tr. 674.

In April 2024, Pringle saw Miner for a medication review. Tr. 659. Pringle said that she underwent eight ECT treatments (three a week) with Dr. Mahmood, but she questioned whether they were beneficial. Tr. 659. Dr. Mahmood said that it "would be slow going" and she needed to call if she wanted to continue. Tr. 659. She said ECT didn't help with "the voices, but it eased the suicidal thoughts." Tr. 659. She also said that her auditory hallucinations "might [have] eased a little during the ECT, but they're back." Tr. 659. Also, the anesthesia was hard on her body and she was getting headaches, but she wasn't sure if her headaches were from allergies. Tr. 659. Pringle's boyfriend, who was present at the visit, said that he saw in Pringle "a lot of anxiety, more … than depression" and that she was "zoned out a lot." Tr. 659. On exam, Miner found that Pringle was appropriately dressed, well-groomed, and cooperative. Tr. 672. She was fidgety, attentive, and polite, with good eye contact. Tr. 672. She had a depressed and anxious mood, an anxious affect, appropriate speech, and logical, goal-directed, coherent, and spontaneous thought processes. Tr. 672. Pringle reported auditory and visual hallucinations, but she had appropriate thought content and denied delusions.

7

Tr. 672. She had no memory disturbances, appropriate insight, and fair judgment. Tr. 672. Miner prescribed Ativan for anxiety, discussed with Pringle potentially switching medications, and noted that Pringle "agree[d] to restart therapy." Tr. 660.

Later that month, Pringle was evaluated at Ohio Guidestone. Tr. 937. On exam, she had normal speech and a full affect. Tr. 945. She had a euthymic mood,[3] and the evaluator wrote that she "appeared to be content" but also extremely depressed. Tr. 946. Pringle had normal attention and no memory impairments. Tr. 946. She exhibited cooperative behavior and good insight and judgment. Tr. 947. Pringle reported auditory and visual hallucinations, and denied delusions. Tr. 946–47.

In June 2024, Pringle saw Miner at Parkview for a medication follow-up. Tr. 644. She was not at that time in therapy. Tr. 644. Pringle's boyfriend accompanied her and described Pringle as being emotionally flat and hard to communicate with. Tr. 644. Pringle said that she was having "bad thoughts" and described auditory and visual hallucinations. Tr. 644. On exam, Pringle was appropriately dressed, well-groomed, and cooperative. Tr. 656. She was fidgety, inattentive, and polite, with good eye contact. Tr. 656. She had a depressed and anxious mood, an anxious and constricted affect, appropriate speech and thought content, and mild paranoia with goal-directed, coherent,

---

[3]    A euthymic mood is tranquil, neither depressed nor manic. *See* Dorland's Illustrated Medical Dictionary 647 (33rd ed. 2020).

8

and spontaneous thought processes with no delusions. Tr. 656. Pringle had a mild memory disturbance and fair insight and judgment. Tr. 656. Miner adjusted her medications and recommended that she start therapy. Tr. 657.

That day, Miner and Timothy Kowalski, D.O., completed two check-box forms on Pringle's behalf. One was a medical source statement regarding Pringle's ability to perform work-related activities. Tr. 560. In this form, Miner and Kowalski opined that Pringle had moderate limitations in her ability to understand, remember, and carry out very short and simple instructions. She had marked limitations in her ability to perform all of the remaining items: remember locations and work-like procedures; understand, remember, and carry out detailed instructions; maintain attention and concentration for extended periods; and perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances. Pringle had marked limitations in her ability to sustain an ordinary routine without special supervision; work in coordination with or proximity to others without being distracted by them; make simple work-related decisions; and complete a normal workday and workweek without interruptions from psychologically-based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods. She had marked limitations in her ability to interact appropriately with the general public; ask simple questions or request assistance; accept instructions and respond appropriately to criticism from supervisors; get along with coworkers or peers without distracting them

9

or exhibiting behavioral extremes; and maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness. Pringle had marked limitations in her ability to respond appropriately to changes in the work setting; be aware of normal hazards and take appropriate precautions; travel in unfamiliar places or use public transportation; and set realistic goals or make plans independently of others. Tr. 560–61. Dr. Kowaleski and Miner remarked that Pringle had been diagnosed with "schizoaffective disorder–bipolar type" and struggled with auditory and visual hallucinations and paranoid delusions. Tr. 561.

The other form Dr. Kowaleski and Miner completed was a "Social Security Ruling 85–15 Questionnaire." Tr. 562.  They opined that Pringle was unable to do any of the following on a sustained basis: understand, carry out, or remember simple instructions; respond appropriately to supervisors or coworkers; respond appropriately to usual work situations; or deal with changes in a routine work setting. They remarked that Pringle had continuous auditory and visual hallucinations. She was distractable and severely limited in her ability to reasonably remember and carry out instructions. Finally, due to paranoid delusions, Pringle's ability to interact appropriately with others was markedly impaired. Tr. 562.

From September 6 through September 11, 2024, Pringle was admitted to the hospital due to worsening depression with suicidal ideation and hallucinations. Tr. 788. She had a suicide plan. Tr. 799. She said that she had

undergone ECT treatment and that she believed it made everything worse. Tr. 799. Pringle's primary diagnosis was psychosis, not otherwise specified, and major depressive disorder, moderate. Tr. 812.

*State agency opinions*[4]

In December 2023, Matthew Wong Ph.D., tried to review Pringle's record, but there were no treatment notes in the file and there had been no response from Pringle or her representative. Tr. 57. Dr. Wong therefore found that there was insufficient evidence to make a disability determination. Tr. 58. In February 2024, David Dietz, Ph.D., reviewed Pringle's record but the situation remained the same; aside from Maple Heights Behavioral Health Hospital, there were no records in the file and "no new contact f[ro]m" Pringle. Tr. 62–63. Dr. Dietz adopted Dr. Wong's decision. Tr. 63.

*Hearing testimony*

Pringle, who was represented by counsel, testified at the telephonic administrative hearing held in October 2024. Pringle testified that she doesn't cook because she can't "keep [her] mind straight" or read directions. Tr. 46. She

---

[4] When a claimant applies for disability benefits, the State Agency creates a record. The record includes the claimant's medical evidence. A State Agency disability examiner and a State Agency physician or psychologist review the claimant's record and determine whether and to what extent the claimant's condition affects his or her ability to work. If the State Agency denies the claimant's application, the claimant can ask for reconsideration. On reconsideration, the State Agency updates the record and a second disability examiner and doctor review the file and make a new determination. *See, e.g.*, 20 C.F.R. § 404.1615.

isn't motivated to do chores because she has no energy. Tr. 46. Pringle said that being around other people causes anxiety attacks: her chest gets tight, she becomes anxious, and sometimes she cries. Tr. 47–48. This happened when she worked at Walmart. Tr. 48. Her anxiety attacks lasted for about an hour, and afterwards she would have to go home. Tr. 48. Near the end of her employment, she had anxiety attacks every day or a couple of times a week. Tr. 48. Pringle said that she can't leave her house and that, due to depression, she can't get out of bed. Tr. 49.

The ALJ discussed with the vocational expert Pringle's past work as a department retail manager. Tr. 50. The ALJ asked the vocational expert to determine whether a hypothetical individual with Pringle's age, education, and work experience could perform work if the individual had the limitations assessed in the ALJ's residual functional capacity determination, described below. Tr. 50–51. The vocational expert answered that such an individual could not perform Pringle's past work but could perform the following jobs: dishwasher, laundry worker, and cleaner. Tr. 51.

### The ALJ's Decision

The ALJ made the following findings of fact and conclusions of law:

> 1. The claimant meets the insured status requirements of the Social Security Act through December 31, 2028.
>
> 2. The claimant has engaged in substantial gainful activity since April 10, 2022, the alleged onset date (20 CFR 404.1571 *et seq.*).

3. The claimant has the following severe impairments: post-traumatic stress disorder (PTSD); generalized anxiety disorder/social anxiety disorder/panic disorder; depression/bipolar disorder; chronic fatigue syndrome; and schizoaffective disorder, bipolar type. (20 CFR 404.1520(c)).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

5. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity[5] to perform medium work as defined in 20 CFR 404.1567(c) except postural limitations of occasional climbing of ladders, ropes, or scaffolds. Frequent climbing of ramps and stairs. Environmental limitations to avoid more than occasional, concentrated exposure to moving mechanical parts and high exposed places. Can understand, remember and carry out simple instructions, for work not requiring a specific production rate, such as assembly line work, nor work requiring hourly quotas. Capable of using judgement to make simple work-related decisions, with occasional changes in a routine work setting. Occasional interaction with the general public, coworkers, and supervisors.

6. The claimant is unable to perform any past relevant work (20 CFR 404.1565).

7. The claimant was … 54 years old, which is defined as an individual closely approaching advanced age, on the alleged disability onset date. The claimant

---

[5] A residual functional capacity, or "RFC" is an "'assessment of'" a claimant's ability to work, taking his or her "limitations … into account." *Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235, 239 (6th Cir. 2002) (quoting 20 C.F.R. § 416.945). Essentially, it's the SSA's "description of what the claimant 'can and cannot do.'" *Webb v. Comm'r of Soc. Sec.*, 368 F.3d 629, 631 (6th Cir. 2004) (quoting *Howard*, 276 F.3d at 239).

subsequently changed age category to advanced age (20 CFR 404.1563).

8. The claimant has at least a high school education (20 CFR 404.1564).

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569 and 404.1569a).

11. The claimant has not been under a disability, as defined in the Social Security Act, from April 10, 2022, through the date of this decision (20 CFR 404.1520(g)).

Tr. 20–32.

### Standard for Disability

Eligibility for social security benefit payments depends on the existence of a disability. 42 U.S.C. §§ 423(a), 1382(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months[.]" 42 U.S.C. § 423(d)(1)(A); *see also* 42 U.S.C. § 1382c(a)(3)(A).

14

An ALJ is required to follow a five-step sequential analysis to make a disability determination:

1.  Is the claimant engaged in substantial gainful activity? If so, the claimant is not disabled.

2.  Does the claimant have a medically determinable impairment, or a combination of impairments, that is "severe"? If not, the claimant is not disabled.

3.  Does the claimant's impairment meet or equal one of the listed impairments and meet the duration requirement? If so, the claimant is disabled. If not, the ALJ proceeds to the next step.

4.  What is the claimant's residual functional capacity and can the claimant perform past relevant work? If so, the claimant is not disabled. If not, the ALJ proceeds to the next step.

5.  Can the claimant do any other work considering the claimant's residual functional capacity, age, education, and work experience? If so, the claimant is not disabled. If not, the claimant is disabled.

20 C.F.R. §§ 404.1520, 416.920. *see Jordan v. Comm'r of Soc. Sec.*, 548 F.3d 417, 422 (6th Cir. 2008). Under this sequential analysis, the claimant has the burden of proof at steps one through four. *Jordan*, 548 F.3d at 423. The burden shifts to the Commissioner at step five "to prove the availability of jobs in the national economy that the claimant is capable of performing." *Id*. "The claimant, however, retains the burden of proving her lack of residual functional capacity." *Id*. If a claimant satisfies each element of the analysis and meets the

15

duration requirements, the claimant is determined to be disabled. *Walters Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).

**Standard of review**

A reviewing court must affirm the Commissioner's conclusions unless it determines "that the ALJ has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Jordan*, 548 F.3d at 422. "'[S]ubstantial evidence' is a 'term of art'" under which "a court … asks whether" the "existing administrative record … contains 'sufficien[t] evidence' to support the agency's factual determinations." *Biestek v. Berryhill*, 587 U.S. 97, 102 (2019) (citations omitted). The substantial evidence standard "is not high." *Id*. at 103. Substantial evidence "is 'more than a mere scintilla'" but it "means only[] 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Id*. (citations omitted). The Commissioner's "findings … as to any fact if supported by substantial evidence [are] conclusive." 42 U.S.C. § 405(g); *Biestek*, 587 U.S. at 99.

A court may "not try the case de novo, resolve conflicts in evidence, or decide questions of credibility." *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007). Even if substantial evidence or a preponderance of the evidence supports a claimant's position, a reviewing court cannot overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469,

16

477 (6th Cir. 2003). This is so because there is a "zone of choice within which" the Commissioner can act, without fear of judicial "interference." *Lindsley v. Comm'r of Soc. Sec.*, 560 F.3d 601, 605 (6th Cir. 2009) (quoting *Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994)).

**Discussion**

Pringle argues that the ALJ failed to properly evaluate Dr. Kowalski's and Miner's joint opinions.[6] Doc. 8, at 9.

The Commissioner is required to evaluate the persuasiveness of all medical opinions using the following factors: supportability; consistency; treatment relationship, including the length, frequency, purpose, and extent; specialization; and other factors. 20 C.F.R. §§ 416.920c(a), 416.920c(c)(1)–(5).

---

[6]    The ALJ described the opinions as Nurse Miner's opinions. Tr. 29. Pringle doesn't allege that this was error. Indeed, it appears from the handwriting that Miner, who regularly saw Pringle, completed and signed the forms, and that Dr. Kowalski signed off on them. Tr. 561–62. Whether a doctor signed off on a nurse's opinion was relevant under the "treating source" rule, which is no longer in effect. *See, e.g., Pater v. Comm'r of Soc. Sec.*, No. 1:15-cv-1295, 2016 U.S. Dist. LEXIS 83099, at *16 (N.D. Ohio June 27, 2016) (explaining that "[t]he rule … [was] that for a medical opinion signed by both a non-treating source, such as a social worker or counselor, and a treating source to be given controlling weight as from a treating source, the opinion 'must be a medical opinion' and must come from a 'treating source.' Under the law, there is no difference between 'opinions filled out and signed by a treating psychiatrist and opinions filled out by a social worker and then signed—thus adopted—by a treating psychiatrist."); *see also* Revisions to Rules Regarding the Evaluation of Medical Evidence, 82 Fed. Reg. 5844 (Jan. 18, 2017) (abrogating the treating source rule for applications filed on or after March 27, 2017). Because this rule is no longer in effect, whether a doctor signed off on Miner's opinion is immaterial.

Supportability and consistency are the most important factors. 20 C.F.R. §
416.920c(a). Supportability means that "[t]he more relevant the objective
medical evidence and supporting explanations presented by a medical source
are to support his or her medical opinion[] … the more persuasive the medical
opinions … will be." 20 C.F.R. § 416.920c(c)(1). Consistency means "[t]he more
consistent a medical opinion[] … is with the evidence from other medical
sources and nonmedical sources in the claim, the more persuasive the medical
opinion[] … will be." 20 C.F.R. § 416.920c(c)(2). The Commissioner must
explain the supportability and consistency factors when discussing a medical
opinion. 20 C.F.R. § 416.920c(b)(2). "[A]n ALJ need not," however, "specifically
use the terms 'supportability' or 'consistency' in his analysis." *Cormany v.
Kijakazi*, No. 5:21-cv-933, 2022 WL 4115232, at *3 (N.D. Ohio Sept. 9, 2022)
(citing cases). The Commissioner is not required to discuss the remaining
factors. *Id.* "A reviewing court evaluates whether the ALJ properly considered
the factors as set forth in the regulations to determine the persuasiveness of a
medical opinion." *Toennies v. Comm'r of Soc. Sec.*, 2020 WL 2841379, at *14
(N.D. Ohio June 1, 2020) (internal quotation marks and citation omitted).

The ALJ evaluated Miner's opinion as follows:

> The undersigned has fully considered the medical
> opinions and prior administrative medical findings
> as follows: Nathan Minor, NP, completed a medical
> opinion on June 4, 2024, and he opined that the
> claimant had "marked" limitations in every area,
> except for understanding and remembering very
> short and simple instructions, which was
> "moderately" limited. (Ex. 3F pgs. 1, 2). Additionally,

18

he opined that the claimant was not able to understand, remember, and carry out simple instructions on a sustained basis, she could not be able to respond appropriately to co-workers or supervisors on a sustained basis, she was not able to deal with changes in a routine work setting on a sustained basis, and she could not respond to usual work situations on a sustained basis. (Ex. 3F pg. 3). The undersigned has considered this opinion and finds that it is not persuasive. First, residual functional capacity is defined as the most that the claimant can perform despite her limitations. (20 CFR 404.1545(a)(1)). The undersigned notes that terms such as "moderate" and "marked" do not correlate to any specific functional limitations. Moreover, his check-the-box form wherein he opined the claimant was not able to perform various activities on a sustained basis is not an opinion as to what the claimant is able perform, despite her limitations. This detracts from the persuasiveness of this opinion. Next, his opinion of "marked" limitations is not supported by his examination findings. His treatment records generally noted a depressed and anxious mood, an anxious affect no more than mild memory disturbances, fair judgment, appropriate insight, a cooperative attitude, and a logical thought process. (Ex. 5F pgs. 32, 66, 111, 125). In June 2024, Mr. Minor found that the claimant was mildly paranoid, with a depressed and anxious mood, a constricted affect, and her thought content was appropriate to topic. (Ex. 5F pg. 16). Additionally, she had mild memory disturbances. (Id.). These findings do not support his opinion of "marked" limitations. Finally, his opinion is not consistent with other records in the file. On February 14, 2024, Dr. Mahmood saw the claimant and his examination revealed good eye contact, a depressed mood and an anxious affect, her thought process was organized, she denied hallucinations, and her insight and judgment were limited. (Ex. 5F pg. 34). The claimant underwent a diagnostic evaluation on April 17, 2024, and she had a full affect and normal speech. (Ex. 9F pg. 92). Her mood was euthymic, although she appeared depressed.

19

> (Ex. 9F pg. 93). Additionally, she had a normal memory and attention, and she reported auditory and visual hallucinations. (Id.). The claimant's behavior was cooperative, and she had good insight and judgment. (Ex. 9F pg. 94). These findings are not consistent with "marked" limitations and diminish the persuasiveness of his opinion.

Tr. 29.

First, Pringle disagrees with the ALJ's evaluation of Miner's opinion and recites evidence that she believes supports Miner's opinion. Doc. 8, at 10–13, 15. The ALJ discussed the evidence that Pringle cites, including her medications, medication changes, ECT treatment, hospitalizations, and reported symptoms. Tr. 26–28. Citing evidence and disagreeing with the ALJ's conclusion does not show that the ALJ's decision is unsupported by substantial evidence. *See, e.g., Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997) ("The decision of an ALJ is not subject to reversal, even if there is substantial evidence in the record that would have supported an opposite conclusion, so long as substantial evidence supports the conclusion reached by the ALJ.").

Pringle points out that "the state reviewing physicians made no opinions about [Pringle's] abilities finding insufficient evidence and thus, there are no contrary opinions upon which the ALJ relies." Doc. 8, at 13–14. But the Sixth Circuit "ha[s] previously rejected the argument that a residual functional capacity determination cannot be supported by substantial evidence unless a physician offers an opinion consistent with that of the ALJ." *Mokbel-Aljahmi v. Comm'r of Soc. Sec.*, 732 F. App'x 395, 401 (6th Cir. 2018); *see Tucker v.*

20

*Comm'r of Soc. Sec.*, 775 F. App'x 220, 226 (6th Cir. 2019) ("No bright-line rule exists in our circuit directing that medical opinions must be the building blocks of the residual functional capacity finding").

Pringle argues that the reasoning that the ALJ provided was "flawed." Doc. 8, at 14. She claims that Miner's opinion "conveys [Pringle's] maximum abilities," and that "the very terms that the ALJ critiques as not correlating to specific functional limitations, ie 'moderate' and 'marked' are terms SSA routinely uses in its disability analysis both in the evaluation of listings and in the RFC findings." *Id.* at 14–15. Pringle's claims fail. It is true, as the ALJ found, that Miner's opinions didn't describe what, despite Pringle's limitations, she could still do. Tr. 29, 560–62; *see* 20 C.F.R. § 416.945(a)(1) (defining the RFC as "the most [claimants] can still do despite [their] limitations."); Soc. Sec. Ruling 96-8p, 1996 WL 374184, at *1 (SSA July 2, 1666) ("RFC is not the *least* an individual can do despite his or her limitations or restrictions, but the *most.*"). And while terms like *moderate* and *marked* are used to rate the severity of mental impairments at steps two and three of the sequential evaluation process, these terms are not used to evaluate the RFC.[7] *See* Soc. Sec. Ruling 96-8P, 1996 WL 374184, at *4 ("[T]he limitations identified in the "paragraph B" and "paragraph C" criteria are not an RFC assessment but are

---

[7]  In fact, the "Medical Source Statement" form that Miner completed cites 20 C.F.R. § 404.1520a, Tr. 560, which covers the Agency's evaluation at steps two and three, not the RFC. *See also* Social Security Ruling 96-8P, 1996 WL 374184, at *4 (S.S.A. July 2, 1996).

used to rate the severity of mental impairment(s) at steps 2 and 3 …. The mental RFC assessment … requires a more detailed assessment by itemizing various functions contained in the broad categories found in paragraphs B and C of the adult mental disorders listings in … the Listing of Impairments."); *see Frase v. Comm'r of Soc. Sec. Admin.*, No. 5:22-cv-1699, 2023 WL 4935935, at *9 (N.D. Ohio July 17, 2023) ("State agency psychologists are instructed by agency policy that 'severity ratings or nonspecific qualifying terms (e.g., moderate, moderately severe) ... do not describe function[ing] and do not usefully convey the extent of capacity limitation.'") (quoting SSA POMS DI24510.065), *report and recommendation adopted*, 2023 WL 4931931 (N.D. Ohio Aug. 1, 2023).

Pringle argues that "[h]aving good eye contact should not detract from the severity of the symptoms described in all of the patient notes" regarding Pringle's exam findings. Doc. 8, at 15. But the fact that Pringle had good eye contact during her exams is relevant to the ALJ's determination that, despite Pringle's symptomatic exam findings, she maintained a certain level of functioning: good eye contact; cooperative behavior; normal, or, at worst, mildly impaired memory; organized and logical thought processes; normal speech; and insight and judgment that ranged from limited to good. Tr. 29. This was a proper basis for discounting Miner's opinion.

Finally, Pringle contends that the ALJ didn't "properly consider" all of the required factors. Doc. 8, at 15. But the ALJ is only required to articulate

22

two of the factors—supportability and consistency, *see* 20 C.F.R. § 416.920c(b)(2)—which the ALJ articulated. Tr. 29. While the ALJ must consider the other factors, 20 C.F.R. § 416.920c(b)(2), Pringle hasn't shown that the ALJ failed to do so.

**Conclusion**

For the reasons explained above, I affirm the Commissioner's decision.

Dated: May 12, 2026

 */s/ James E. Grimes Jr.* 
James E. Grimes Jr.
U.S. Magistrate Judge